**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

KRYSTLE BERNAL and
AMANDA KROL,
on behalf of themselves and all similarly situated individuals,

        Plaintiffs,

v.

GEORGE BURNETT, an individual,
WILLIAM OJILE, an individual,
ALTA COLLEGES, INC., a Delaware corporation;
WESTWOOD COLLEGE, INC., a Colorado corporation,
TRAV CORPORATION, a Colorado corporation d/b/a Westwood College and Westwood
College Online,
GRANT CORPORATION, a Colorado corporation d/b/a Westwood College,
WESGRAY CORPORATION, a Colorado corporation d/b/a Westwood College,
EL NELL, INC., a Colorado corporation d/b/a Westwood College,
PARIS MANAGEMENT COMPANY, a Delaware corporation d/b/a Redstone College,
ELBERT, INC., a Colorado corporation d/b/a Westwood College, and
BOUNTY ISLAND CORPORATION, a Delaware corporation formerly d/b/a Redstone College,

        Defendants.

---

## CLASS ACTION COMPLAINT

---

"We are appalled by the actions of our employees." This was Westwood College's

August 4, 2010 response to the Government Accountability Office's investigation into

Westwood and other for-profit colleges that revealed systemic fraud.[1] Defendants[2] are not alone

---

[1] Jaclyn Allen, *For-Profit Colleges Caught on Tape Lying to Students,* ABC 7 News, Aug. 4, 2010,
  http://www.thedenverchannel.com/news/24518537/detail.html.

in expressing this sentiment.  Over the last two years, more than 700 students and more than 50 former employees from across the nation have contacted Plaintiffs' counsel raising the same complaints about Defendants' for-profit colleges.  In the last month, the United States Senate has joined the students' cause.

Defendants operate for-profit colleges, which, for years have been deceiving tens of thousands of students into pursuing an "education" that has little-to-no value.  Defendants follow a simple formula: recruit those with the greatest financial need and enroll them in high-cost institutions to maximize the amount of federal funding Defendants receive.  In 2008, Alta Colleges received $181 million in federal funds ($27.5 million in Pell Grants and $154.4 million in federal loans).

On June 24, 2010, the United States Senate Committee on Health, Education Labor & Pensions ("HELP Committee") began a series of hearings on the emerging risk of the for-profit education sector.  The report[3] from the first hearing found that for-profit colleges spend huge sums of Federal Title IV dollars – taxpayer dollars – on TV advertisements, billboards, phone solicitation, web marketing and aggressive sales staff.  *See* Ex. A.  It noted that the for-profit industry obtains an alarming 25% of the $89 billion in Federal Title IV loans and grants, despite enrolling only 10% of post-secondary education students. Ex. A at 3-4.  By spending an average of 31% of their revenue on advertising – as compared to the 2% that is usually spent by

---

[2] As used herein, "Defendants" refers to all named Defendants; "Corporate Defendants" refers to Alta Colleges, Westwood College, Grant Corp., Wesgray Corp., El Nell, Paris Management Co., Elbert, and Bounty Island Corp.; and "Individual Defendants" refers to Burnett and Ojile.

[3] HELP Committee, Emerging Risk?: An Overview of Growth, Spending, Student Debt and Unanswered Questions in For-Profit Higher Education (June 24, 2010) (attached as Ex. A).

community colleges – Defendants[4] and others in the industry turn profit margins that are among the highest in corporate America.  Ex. A at 5.  While the HELP Committee's first report was instructive, it barely brushed the surface of Defendants' deceptive trade practices.

The HELP Committee's second hearing on August 4, 2010, zeroed in on Defendants' aggressive sales staff.  Prior to this hearing, the Government Accountability Office (GAO) went undercover to investigate 15 for-profit colleges, including one of Defendants' institutions.[5]  At the hearing, the GAO informed the HELP Committee that all 15 schools engaged in "fraud, deceptive practices or made misleading statements to prospective students."[6]  At the hearing, Gregory Kutz, Managing Director of GAO's Office of Forensic Audits and Special Investigations, testified that the for-profit college industry is like "the wild west" where it "was difficult to sift through fact from fiction."[7]  A former Westwood admissions representative, Joshua Pruyn, also testified at the August 4, 2010, hearing.  Pruyn testified that the deception reported by Kutz was not the work of "rogue representatives.  It was institutional."[8]  Senator Harkin, HELP Committee Chairman, responded to Pruyn's testimony by stating "I continue to be amazed by the questionable and sometimes outright illegal practices…that Mr. Pruyn talked

---

[4] The Restated Financial Statements for 2004 of Alta Colleges, Inc., and Subsidiaries show that recruiting made up almost $50,000,000 of its $157,350,000 operating expenses.  Ex. B.  The following year, the amount spent on recruiting leapt up to $71,857,000, nearly a third of its operating expenses.  *Id.*
[5] Testimony of Gregory Kutz before the HELP Committee, *For-Profit Colleges: Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices* (Aug. 4, 2010) (attached as Ex. C)
[6] Statements of Sen. Tom Harkin at *For-Profit Schools:  The Student Recruitment Experience before the S. Comm. On Health Education Labor & Pensions*, 111th Cong. ___ (2010) ("Second HELP Committee Hearing").  The complete video and audio for the Second HELP Committee Hearing is accessible at: http://help.senate.gov/hearings/hearing/?id=19454102-5056-9502-5d44-e2aa8233ba5a (last accessed Aug. 5, 2010).
[7] Statements of Gregory Kutz at Second HELP Committee Hearing.
[8] Statements of Joshua Pruyn at Second HELP Committee Hearing.

about."[9]   Harris Miller, President of Career Colleges Association of which Defendants are members, agreed that the claims of deception were well-founded, telling member schools that "I am not going to try to defend the indefensible, such as the findings of the GAO report, however. And I suggest you should not either."[10]

Prior to the congressional scrutiny, Defendants flourished in the unscrupulous culture of the for-profit college industry, making it clear why the words "for profit" come before "college." Through their institutions known as Westwood College, Westwood College Online and Redstone College (collectively "Westwood"), Defendants have perfected the art of preying on the hopes and dreams of vulnerable students who are desperately seeking better lives.   Defendants spend more on recruiting than any other portion of their operations – including education instruction. The extreme amount of money spent on advertising has produced flashy Westwood commercials, which offer the enticing promise that "your future is in your hands," followed by the invitation to find out "what will it hold?"   Students understandably answer with dreams of graduate degrees; high-paying, gratifying careers; and, more than anything else, brighter futures. The reality is that Westwood knows exactly what the answer is for many of these students: lives impaired by insurmountable debt obtained in the pursuit of useless degrees.

As detailed in the accounts of more than 700 students, more than 50 former employees, and the United States Senate, Defendants engage in deceptive trade practices at every step of the process from recruitment to post-graduate job placement.   Defendants train their admissions representatives to provide uniform misrepresentations and make material omissions as to the costs and fees related to Westwood programs; job placement opportunities and salary

---

[9] *See supra* note 6.
[10] Letter dated Aug. 3, 2010, from Harris Miller to CCA members, attached as Ex. D.

expectations; accreditation status and the transferability of credits; and the academic qualifications and roles of the admissions representatives themselves.  As revealed at the Second HELP Committee Hearing, when Defendants' conduct in these areas became so outrageous that the Accrediting Commission of Career Schools and Colleges ("ACCSC") issued a show cause order asking why Westwood should be entitled to keep its accreditation, Westwood responded by telling ACCSC "that they had chosen to make application at another agency…because they were unable to meet our standards with regards to student achievement."[11]  Notably, ACCSC is the same accrediting agency that had standards lax enough to enable several of the other 15 for-profit colleges exposed in the GAO report to engage in blatantly deceptive trade practices.

Defendants are appalled by the actions of their employees, as they should be.  They are not alone.  More than 700 former students, more than 50 former employees, and the United States Senate are appalled too.  Plaintiffs, and the thousands of former and current students they seek to represent, intend to correct Defendants' appalling and illegal behavior through their claims brought under the Colorado Consumer Protection Act ("CCPA") (C.R.S. Section 6-1-101 *et seq.*).

## JURISDICTION AND VENUE

1.     The United States District Court for the District of Colorado has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) as the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which one or more of the members of the putative class are citizens of a state different from any one of the Defendants.

---

[11] Statements of Michale McComis, Executive Director of ACCSC at the Second HELP Committee Hearing.

2.    Pursuant to 28 U.S.C. § 1391(a), venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred here.

3.    Colorado law is appropriately applied to all disputes addressed in this Complaint.

## THE PARTIES

4.    Plaintiff Krystle Bernal ("Bernal") is a resident of Denver, Colorado.  Bernal attended Westwood College at the Denver South Campus from March 2005 to March 2008.  She graduated with a degree in Fashion Merchandising.  For her three short years of attendance, Westwood charged Bernal more than $75,000 in tuition, books, and fees.

5.    Plaintiff Amanda Krol ("Krol") is a resident of Chicago, Illinois.  Krol attended Westwood College Online from March 2004 to May 2009.  She graduated with a degree in Criminal Justice.  For her four years of attendance, Westwood charged Krol more than $85,000 in tuition, books, and fees.

6.    Defendant Alta Colleges, Inc. ("Alta") is the parent company of Westwood Colleges, Inc., which is the operating company for 17 colleges and trade schools located in six states under the names Westwood College, Westwood College Online, and Redstone College.  Alta's for-profit operations offer a wide range of "academic" programs.  Westwood College Online ("WCO") is an internet-based operation offering degree-granting programs structured like those offered at the traditional "brick-and-mortar" schools.  WCO was previously based out of the Denver North campus of Westwood College but was transferred in name only to the Los Angeles campus in 2009.  WCO's operations and recruitment remain in Colorado.

7.    Alta maintains a central corporate structure wherein it designs, plans, and implements the policies, procedures, and decision-making for all of the Westwood and Redstone

College campuses and WCO, in aspects that include, but are not limited to, marketing, operations, educational planning, admissions policy, enrollment, career services, student financial planning, training and management. Through this tight-fisted control, Alta ensures a consistent and standardized course of conduct with respect to its interactions with prospective and current students. Alta wholly owns the seven subsidiary corporations that operate the individual campuses.

8.    TRAV Corporation is a Colorado corporation that operates six Westwood campuses: Denver North; Denver South; Anaheim; Inland Empire in Upland, California; and Houston South, Texas. Until May 2009, WCO was a branch of the Denver North campus for accreditation purposes only.

9.    Wesgray Corporation is a Colorado corporation that operates three Westwood campuses: Los Angeles Main Campus; River Oaks in Calumet City, Illinois; and Chicago Loop Campus. As of May 2009, WCO is a branch of the Los Angeles campus for accreditation purposes only.

10.    Grant Corporation is a Colorado corporation that operates three Westwood campuses: South Bay in Torrence, California; Arlington Ballston in Arlington, Virginia; and Annandale Satellite Campus in Annandale, Virginia. El Nell, Inc. is a Colorado corporation that operates three Westwood campuses: O'Hare Airport Main Campus in Schiller Park, Illinois; Dallas; and Atlanta Northlake Campus.

11.    Paris Management Company is a Delaware corporation that operates the Redstone College Campus in Denver, Colorado.

12.   Elbert, Inc. is a Colorado corporation that operates three Westwood campuses: DuPage Main Campus in Woodbridge, Illinois; Fort Worth; and Atlanta Midtown Campus.

13.   Bounty Island Corporation is a Delaware corporation that formerly operated two Redstone campuses: Redstone College in Los Angeles, California and Redstone Institute in Houston, Texas.  Redstone College was sold in September 2008 and Redstone Institute was shut down in April 2008.

14.   George Burnett is a resident of Colorado.  He has been acting CEO and Director of Alta Colleges since August 2006.  Burnett did not hold an academic position before being tapped as CEO and Director of Alta Colleges.  Rather, he had a history of marketing, online, and technological business experience from his previous position as the Chief Marketing Officer for Qwest Communications International, a large telecommunications company.  Qwest was investigated by the SEC for securities fraud and eventually fined about $250,000,000 for fraudulently reporting $4 billion in revenue and expenses.  As CEO of Alta Colleges, Burnett ushered in an era of aggressive sales and marketing tactics that he honed at Qwest geared to raise revenues and maximize profit.  To this end, Burnett devised, implemented, authorized, or sanctioned the internal policies and the comprehensive training programs that teach Westwood's admissions representatives to engage in the deceptive trade practices described herein.

15.   William Ojile is a resident of Colorado.  He is the Chief Legal and Compliance Officer for Alta Colleges and its subsidiaries and reports to Burnett.  Previous to his current position, Ojile worked alongside Burnett at Qwest.  Ojile's responsibilities include overseeing and assuring the compliance of Alta Colleges and its subsidiaries with state and federal laws as well as those of accreditation and education regulation entities.  These responsibilities include

devising, implementing, authorizing, or sanctioning the internal policies and comprehensive training programs that teach Westwood's admissions representatives to engage in the deceptive trade practices described herein.

## DEFENDANTS' DECEPTIVE TRADE PRACTICES

16.     The more than 700 former and current Westwood students and more than 50 former employees who have contacted Plaintiffs' counsel are spread across the United States, and yet, their descriptions of Defendants' deceptive practices are uniform.   These students, teachers, admission representatives, supervisors, career development representatives, financial aid workers, and administrators paint a clear picture of an organization that preys on potential students through deceptive methods.   These more than 750 voices, along with the findings of the United States Senate and GAO, form the basis of the following general allegations.

17.     Defendants have designed, planned and implemented deceptive trade practices that span the entire course of a student's interactions with Westwood.   These deceptive trade practices are devised, implemented, authorized, or sanctioned by the management of Defendants, specifically the Individual Defendants, and taught to the employees of Defendants through a comprehensive training program to ensure that the well-designed strategy of deception is carried out in a controlled, scripted, and planned manner.   The end result of Defendants' strategy is to generate significant profit on the backs of students.

18.     From the initial contact, Westwood's admissions representatives begin Defendants' standardized, high-pressure, sales-oriented recruiting program with the lone goal of increasing student enrollments to maximize its obtainment of federal and private loan money.   Admissions representatives commit deceptive trade practices by uniformly making knowingly false

representations and material omissions regarding the actual costs and fees associated with enrollment; job placement opportunities and salary expectations; education quality and credit transferability; and the school's accreditation.  Further, the admissions representatives are knowingly misrepresented as academic advisors with the credentials to guide students in important educational and life decisions when the admission representatives are truly sales agents or "bounty hunters"[12] with quota requirements and enrollment-based incentive programs. These misrepresentations and omissions all stem from internal policies or training programs that have been devised, implemented, authorized, or sanctioned by the Individual Defendants.

### A.    Deceptive Trade Practices Relating to Costs and Fees

19.    Defendants engage in deceptive trade practices by uniformly and knowingly failing to disclose the complete cost of Westwood's education programs.   These uniform misrepresentations mislead or deceive potential students as to the costs and fees related to enrollment at Westwood.  Defendants make these misrepresentations with the intent of inducing students to enroll at Westwood in order to maximize the money Defendants collect from federal and private loans.  The Individual Defendants devise, implement, authorize, or sanction the policies or training programs that cause the Corporate Defendants' admissions representatives to engage in this deceptive trade practice.

20.    At the Second HELP Committee Hearing, Sen. Harkin asked Mr. Kutz, "What is the likelihood that a typical student considering a for-profit school could actually get an accurate understanding of the cost of the program?"   Kutz answered, "It's highly unlikely."   This is certainly the case at Westwood.

---

[12] Statement of Sen. Barbara Mikulski at the Second HELP Committee Hearing.

21.   Costs and fees at Westwood are determined based on a nine-week school term with five terms in one calendar year.   Each term has a base tuition and additional fees for books, shipping, tool kits, lab fees, online fees, and certification exams.   Currently, tuition for a Bachelor's degree program for a full-time student entering a 14+ term program costs $4,144 to $5,068 per term.[13]   Total program costs for a 14+ term program are approximately $68,174 to $81,905 for three years.   *Id.*   These astounding tuition costs vary by program and campus location.

22.   Admissions representatives knowingly misrepresent the total costs of education. Admissions representatives only reveal the program costs on a "per term" basis because most traditional schools have only two to three terms per year while Westwood has five.   Defendants built this "per term" deception strategy into the admissions department in order to avoid revealing the full $70,000+ cost of a standard Westwood degree.

23.   If a prospective student pushes the admissions representative to reveal a total cost, the admissions representative then exaggerates the costs of other schools in order to make Westwood seem like a good deal.   The recent GAO undercover investigation recorded one Westwood admissions representative telling a prospective student that the bachelor's degree for which Westwood charges $50,000 to $75,000 would range from $100,000 to $200,000 at "more traditional schools."   In reality, the same degree from the state's flagship university would cost only $36,000.[14]

---

[13] Financial Information Addendums and Tuition sheets are available:  http://www.westwood.edu/financial-aid/tuition/ (last accessed Aug. 5, 2010).

[14] *See supra* note 7.

24.    Further, admissions representatives uniformly fail to state that the costs provided as term tuition do not include books, course materials and tool kits.  In fact, each one of these is an independent cost charged to the student and not reflected in the tuition price.  Additionally, admissions representatives do not mention the "online fee" for students enrolling in the online program.  This fee is currently as high as $8,020.[15]

25.    Even if a student is able to locate the costs and fees chart in a catalog addendum that is several screens removed from Westwood's online home page, the disclosures therein are presented in a manner that confuses and misleads the student.  By way of illustration, the catalog addendum for the March 2009[16] term lists prices by varying time periods "per credit," where "credit" refers alternately to an individual credit and to the entire program course, and "per term" where "term" refers alternately to the number of terms in the program and to the entire program course.  A "Grand Total" column is provided, but the amount displayed cannot be readily reached using the listed figures and time periods.  The inaccuracy of the "Grand Total" removes any credibility of that figure.  The "disclosures" provided in the catalog addendums are insufficient to put any student on notice of actual fees and costs associated with attendance, particularly in light of the conflicting information provided by admissions representatives.

26.    Importantly, Defendants' deception in this area is ongoing.  On August 4, 2010, CBS4 Denver reported that during two hidden-camera investigations at Westwood, undercover prospective students were told lies and misrepresentations regarding the program's costs and how those costs would be repaid.[17]

---

[15] *See supra* note 13.
[16] March 2009 catalog addendum for the Denver North and Online campuses attached as Ex. E.
[17] Rick Sallinger, *Westwood College Investigated by Federal Gov't*, CBS4 Denver, Aug. 4, 2010, http://cbs4denver.com/local/westwood.college.goa.2.1843637.html (last accessed Aug. 5, 2010).

**B.      Deceptive Trade Practices Relating to Job Placement Opportunities and Salary Expectations**

27.    Defendants engage in deceptive trade practices by uniformly and knowingly making false representations regarding job placement opportunities and salary expectations intended to bolster the students' confidence in the quality and value of a Westwood education. The Individual Defendants devise, implement, authorize, or sanction the policies or training programs that cause the Corporate Defendants' admissions representatives to engage in this deceptive trade practice.

28.    Westwood's admissions representatives promote a school-assisted placement rate of more than 85% from 2005-2008, though the representatives do not provide any support for how this figure was calculated.  By way of comparison, the 2002-2005 employment rates at the Texas-based Westwood campuses were 54.3%, with only one-third of graduates acquiring positions with school assistance.[18]  Moreover, the admissions representatives make uniform misrepresentations about job placement opportunities by falsely touting relationships with major companies like Sony and Electronic Arts in order to convince the prospective student that a job can be easily obtained from a major company with a Westwood degree.

29.    Job placement statistics are also knowingly misrepresented and inflated by admissions representatives through Westwood's mischaracterization of jobs that students obtain after leaving Westwood.  By way of example, Westwood may consider a copy assistant at Kinko's to be a job in the graphic design field or a shift manager at Quizno's as a business management job.

---

[18] *United States of America and Brazell, et al. v. Alta Colleges, Inc., et al.*, Amended Complaint of the United States of America, No. 3:05-CV-0319-N, United States District Court for the Northern District of Texas, Dallas Division, filed April 7, 2009.

30.   Westwood's admissions representatives also routinely inflate the starting salary that a prospective student can expect to make after graduating with a Westwood degree by tens of thousands of dollars.  This deceptive trade practice is intended to convince prospective students to take on the enormous debt required to complete a Westwood program based on the false hope that the prospective student could support the loan payments after graduation.

31.   For example, admissions representatives would routinely promise a game-design student a high-paying job at a major development company when, in reality, the highest possible position they could obtain is a game-tester at approximately $10 an hour.  Further, game-tester is a job that can be obtained without a college degree and certainly without $80,000 in debt.

**C.    Deceptive Trade Practices Relating to Accreditation and Credit Transferability**

32.   Defendants engage in deceptive trade practices by uniformly and knowingly misrepresenting the quality of a Westwood education through deceptive accreditation claims and misleading credit transferability options.  The Individual Defendants devise, implement, authorize, or sanction the policies or training programs that cause the Corporate Defendants' admissions representatives to engage in this deceptive trade practice.

33.   Westwood's campuses are *nationally* accredited by one of two agencies: the ACCSC[19] or the Accrediting Counsel for Independent Colleges and Schools ("ACICS").[20]  The Westwood College website promotes that it is a candidate for regional accreditation by the Higher Learning Commission.  The website fails to clearly disclose that it was recently denied

---

[19] ACCSC accredits the following campuses: Anaheim, Inland Empire, South Bay, Denver North, Denver South, Houston South, Arlington Ballston and Annandale Satellite.

[20] ACICS accredits the following campuses: Los Angeles, DuPage, Chicago Loop, O'Hare Airport, River Oaks, Atlanta Midtown, Atlanta Northlake, Dallas, Fort Worth and the California Online campus.

accreditation.[21]   The language of the website is designed to lead a student to believe that the regional accreditation process is simply a lengthy endeavor that Westwood is still under-taking, rather than to disclose its previous failed attempts at approval.   Indeed, prior to being denied regional accreditation, Defendants led students to believe that approval was just around the corner and that accreditation would be retroactive, both of which are false.   ACCSC Executive Director Michale McComis testified that a prospective student would have to "dig" in order to figure out the significance of the different accreditations, as this information is not made readily available.[22]

34.   During solicitations, Westwood admissions representatives tout the party line that "we're fully 100% accredited" and that Westwood "must" be accredited because it receives federal financial aid.   Through these scripted responses, the admissions representatives attempt to avoid the topic of regional accreditation.   If the prospective student knows enough to question the recruiter about regional accreditation, the admissions representatives tell the prospective student that regional accreditation is coming "next October."

35.   The deception as to accreditation status is significant because accreditation is a critical decision-making factor for students who may wish to transfer their Westwood credits to pursue degrees at another institution in the future or to seek employment that considers accreditation.   It is common industry knowledge that nationally-accredited institutions typically accept credits from both regionally- and nationally-accredited institutions, but that regionally-accredited institutions generally will not accept credits from nationally-accredited institutions.

---

[21] In order to determine Westwood's candidacy status, the potential student must go to a third-party website maintained by The Higher Learning Commission where the Public Disclosure Notice on Westwood College may be obtained at http://www.ncahlc.org/download/_PublicDisclosureNotices/PDN_2882.pdf (last accessed Aug. 5, 2010).
[22] See *supra* note 11.

However, the admissions representatives uniformly and knowingly mislead students into believing that national accreditation is of equal or even greater value than regional accreditation and uniformly and knowingly omit any explanation of the various forms of accreditation. The students, who rely on the guidance of their admissions representatives to understand how the accreditation and transfer processes work, are naturally deceived by the admissions representatives' statements.

36.   By way of example, one admissions representative informed a potential student that Westwood credits would be transferable to the University of Florida or Florida State University if the student ultimately got an offer from a "classier, shinier school," as long as the course descriptions were the same. Representatives from both Florida colleges confirmed that they would not accept credits from Westwood College because Westwood is not regionally-accredited.

**D.     Deceptive Trade Practices Relating to the Role and Qualifications of Admissions Representatives**

37.   Defendants engage in deceptive trade practices by uniformly and knowingly misrepresenting that employees, whose primary job duties are to recruit students, are "academic counselors" with the authority and qualifications to assist the student in making critical educational decisions. The Individual Defendants devise, implement, authorize, or sanction the policies or training programs that cause the Corporate Defendants' admissions representatives to engage in this deceptive trade practice.

38.   When a prospective student contacts or is contacted by Westwood, the student is restricted to speaking only with an admissions representative until the application process has

been completed.  The admissions representative or "bounty hunter"[23] uniformly and knowingly misrepresents to the student that he or she is capable of addressing any of the student's concerns about the school, including quality of the education, costs and fees, financial aid options, course offerings, and credit transferability.

39.    However, admissions representatives are undeniably recruiters who are tasked with selling a product.   In fact, the job description for this position has no relationship to an educational or financial aid background – rather it specifies that the job category is "Sales" and a candidate is required to have "one to three years of sales experience," an "ability to work in a sales driven environment" and a "strong track record of sales success."[24]   Indeed, a 2008 case study of the Alta call centers by a third-party, CosmoCos, referred to the function of the admissions representatives as "call center agents" who are "[a]cting as counselors."

40.    Once hired, an admissions representative is put through a comprehensive training program that teaches the admissions representatives how to make uniform misrepresentations to potential students to convince the individuals to enroll at Westwood.  Defendants manufacture PowerPoint presentations that teach the "art of closing."   These presentations emphasize that time is money and that each admissions representative needs to close and enroll as many students as possible in order to be paid well.  To drive their point home, Defendants instruct admissions representatives to find a prospective student's "pain point and dig."[25]

41.  In order to facilitate the enrollment process, Defendants teach admissions representatives how to "overcome common objections" that arise during the phone script given

---

[23] *See supra* note 12.
[24] Job Posting attached as Ex. F.
[25] PowerPoint Cell attached as Ex. G.

to admissions representatives to assure that the misrepresentations made to potential students are uniform in nature.[26]   Defendants' PowerPoint presentation on this topic teaches the admissions representatives how to talk the potential students out of concerns like Westwood's high costs and lack of credit transferability.  *Id.*

42.   These deceptive practices taught through training programs, PowerPoint presentations, and uniform scripts are viewed by the admissions representatives as necessary, however, because admissions representatives are required to meet a minimum enrollment quota to maintain employment and to receive promotions.  They are further incentivized to sign-up as many students as possible over that quota by participating in competitive "games" based on applications, actual enrollments, and sales tactics.

43.   "Winners" are rewarded with paid vacation days, gift cards to local restaurants, parties and exotic vacations – all based on the number of enrollments the admissions representative achieves.  For example, in May 2008, the admissions representatives were offered a "fun packed fully paid vacation in sunny Cancun" for those who qualified for "Elite" status based on the number of students the admissions representative enrolled at Westwood.[27]   For holidays like the Fourth of July, Westwood rewards its admissions representatives with "15 minutes off" for getting a potential student to apply and additional time off when other milestones are reached.  Ex. J.  For admissions representatives based in Denver, tickets to the Colorado Rockies are given out to those who can provide enough new enrollees to meet Westwood's "business" "budget."[28]

---

[26] PowerPoint attached as Ex. H.
[27] Email dated May 1, 2008 attached as Ex. I.
[28] Email dated March 24, 2008 attached as Ex. K.

44.   Defendants further foster a competitive sales environment by dividing admissions representatives into teams with names like "Champions," "Future" and "Drivers" and encouraging them to send daily emails to each other announcing new sales in a demeaning and degrading manner.   By way of illustration, an admissions representative sent an email[29] from "The Drivers" team stating "Everyone Hit the DECK!!!!!!!!!!!!!   A Drive BY JUST Occurred!" with a violent depiction of a drive-by shooting (below) to let other teams know that one sales representative had secured his second application of the day.



In another string of emails, a team called the "ADA's" formally challenge the other teams to an "app-writing" competition with "dinner and drinks" for the winners.[30]

45.   These competitions are important to admissions representatives because admissions representatives are paid dependent upon how many students they enroll.   Defendant Burnett admitted through a statement released on Westwood College's website that admissions

---

[29] Email dated April 3, 2008 attached as Ex. L.
[30] Email String attached as Ex. M.

representatives are currently being paid based on "enrollment targets."[31]   Defendants attempt to

disguise this practice by using a point system called "PGEs" for tracking performance, which

claims to take into account several factors in addition to pure enrollments.   Yet, it's very clear

that enrollment figures are the be-all and end-all for admissions representatives.   For example, in

a July 10, 2007 publication from Defendants, the "Final Drive for August" is highlighted and the

admissions representatives are encouraged to enroll enough students to be invited to the

"November Gold & Platinum Banquet for special recognition!!" Ex. N (emphasis in original).

This same publication notes that the "Standards of Performance" for an admissions

representative are based on "three key efficiencies: Interviews, Applications, RGL

Applications," – each clearly reflecting the admissions representative's ability to enroll students.

*Id.*

46.   Admissions representatives are well aware that the other side of this encouragement

is that they will be terminated if they do not meet the minimum quota for enrollments.   Former

admissions representatives now lament pushing people into massive debt just to keep their job.

As one former admissions representative recalled, a Westwood vice president declared, "We

don't need compassion.   We need sharks."

47.   Defendants further foster a competitive sales culture by treating potential students

as a commodity and encouraging admissions representatives to think of the individuals as a

means to satisfy their "budget" or "gross volume" needs.   In a June 2007 publication called the

"Monthly National Post, Defendants urge the admissions representatives to "exceed out (sic)

---

[31] *WESTWOOD COLLEGE TAKES IMMEDIATE, DECISIVE ACTIONS FOLLOWING SENATE COMMITTEE
HEARING AND GAO INVESTIGATION,* Aug. 8, 2010, http://www.westwood.edu/why-westwood/about-
us/recent-news/?i=859 (last accessed Aug. 9, 2010).

start budget of 249 students." Ex. O.  In order to do this, Defendants counsel the admissions representatives to stick to "the new 24, 48, 72 hour follow-up rule" to assure that the potential students are sufficiently hounded by Westwood.  *Id.*  In an email to admissions representatives advertising baseball tickets to those who get a sufficient number of applications, the applications are referred to as "business" necessary to meet Westwood's "budget."  Ex. K.

48.    To make sure that their "budgets" are met, Defendants reinforce rules like the 24/48/72 hour follow-up calls through skits at events attended by admissions representatives. These skits poke fun at the process of enrolling individuals into an education that costs upwards of $80,000.  For example, the focus of one called "As Westwood College Turns" is the admissions representatives' all-encompassing goal of getting as many "apps" as possible such that they could "ring the bell" and celebrate enticing another individual, and sometimes the family members of the individuals, to enroll at Westwood.  Ex. P.

49.    As if the monetary-incentives were not made clear enough to admissions representatives, Defendants frequently remind admissions representatives that their salary is tied to the number of applications they generate for Westwood.  In one PowerPoint, Defendants break down the 40-hour work week to show that each admissions representative is expected to make 500 calls per week or 28 dials an hour because "the beginning process is……a numbers game!" Ex. Q.  Another presentation instructs the admissions representative to "[w]ork with a sense of urgency" to "get the students through the enrollment completion process and started in class." Ex. R.  A third presentation summarizes the "Importance of Time Management" by explaining that "[m]aking the most of your day…will give you more money in your pocket."  Ex. S.  The

presentation goes further to state that aggressively pursuing leads "[o]nce again…will also get your more money in your pocket." *Id.*

50.     David Hawkins, Director of Public Policy and Research at the National Association for College Admission Counseling, testified in front of the HELP Committee that "[r]ewarding top recruiters with money and perks is an invitation to mislead applicants" and that the "boiler-room style" of recruitment has had real harmful consequences for students and taxpayers.[32]   At Westwood, the deceptive trade practices executed by the admissions representatives have had a disastrous effect on tens of thousands of families.

## ALLEGATIONS SPECIFIC TO KRYSTLE BERNAL

51.     Krystle Bernal has been subjected to Westwood's deceptive trade practices.

52.     In or around 2005, Bernal began researching how to achieve a degree in fashion merchandising.  Her research led to an admissions representative calling Bernal at her home one evening.

53.     After the initial contact, Bernal received phone calls from the same Westwood admissions representatives at least once a day for a week.  After a week, Bernal began to stop answering her phone because she was reluctant to enroll.  At this point, the calls decreased in frequency to approximately one call every other day.

54.     The incessant contacts from Westwood eventually wore Bernal down such that she agreed to go to the Denver South campus for a face-to-face meeting with an admissions representative.

---

[32] Statement of David Hawkins at Second HELP Committee Hearing.

55.    At the first of two meetings, Westwood's admissions representatives informed Bernal that tuition for the three-year Fashion Merchandising program would be $45,000.  Due to this high cost, Bernal was reluctant to enroll.  Bernal's reluctance prompted the admissions representative to push her even harder.  The admissions representative challenged Bernal, telling her that if she could not commit to Westwood, then she was not committed to improving her future.

56.    When Bernal still expressed concern about the tuition costs, the Westwood admissions representative told her that, although it seemed like a lot of money, Westwood would provide her with job placement in a high-paying career.  Bernal was told that she would be earning at least $65,000 her first year out of college.

57.    The admissions representative further promised that Bernal need not worry about the tuition because the Westwood degree would guarantee her a better future.  In support, the Westwood admissions representative stated that a very high percentage – 80% to 90% – of Westwood graduates were working in their field of study three-to-six months after graduation. The Westwood admissions representative also touted Westwood's alleged affiliation with major companies in the fashion merchandising industry as a cause for the extremely high job-placement rate.

58.    The Westwood admissions representative also told Bernal that federal loans with low interest rates would cover most of the tuition and that if the tuition increased, she could get approved for a private loan from Sallie Mae, or other sources of financial aid.

59.   The Westwood admissions representative assured Bernal that Westwood College was fully accredited, which Bernal understood to mean that Westwood had a regional accreditation such that her credits could transfer to other educational institutions.

60.   At this first face-to-face meeting, Westwood's admissions representative had enrollment documents printed and ready for Bernal to sign in order to add pressure to the sales pitch.

61.   Bernal left the first meeting without enrolling, but after subsequent calls from the admissions representative, Bernal agreed to a second face-to-face meeting.  It was during this second meeting that Bernal enrolled in the Fashion Merchandising program at Westwood College's Denver South Campus.

62.   Immediately after enrolling, Bernal was handed off to financial aid representatives who guided her through the financial aid application process.  While applying for financial aid, Bernal learned for the first time that the program would cost more than $20,000 more than the figure provided by the admissions representative.  Since Bernal had already committed to the program, she proceeded to apply for more than $65,000 in federal and private student loans.

63.   Two years into the program, Bernal was informed that her loans still did not cover the cost of tuition because of increases in costs and fees.  Since she had already invested $65,000 into the program, Bernal agreed to take out approximately $10,000 more in order to complete her degree.  Bernal felt that she had no choice but to finish the program because of the incredible debt she had already incurred.

64.    Around the same time, Bernal learned that Westwood was only nationally accredited and was merely a candidate for regional accreditation.  This fact surprised Bernal, as she had believed from the beginning that Westwood was regionally accredited.

65.    During Bernal's final quarter at Westwood, a financial aid representative told Bernal that she was carrying an account balance of almost $4,000 due to tuition increases not covered by her federal and private loans.

66.    Bernal was told that if she did not pay her account balance in full by graduation, she would automatically receive an Apex loan in the amount of her account balance with an interest rate of 18%, and she would not receive her diploma.

67.    In order to avoid the high interest rate and obtain her degree, Bernal arranged for her family members to satisfy her account balance prior to her graduation.

68.    In the quarter leading up to her graduation, Bernal met with members of Westwood's "career placement team."  When Bernal informed the team that she intended to seek a job in fashion merchandising – the career towards which she had now paid $75,000 – Westwood's representatives told Bernal to not "aim so high."  Instead, she was advised to look for an "entry level" position in retail sales at local department stores – the very position that Bernal had prior to attending Westwood, and for which she knew she did not need a college degree.

69.    Bernal graduated in or around March 2008 with a Bachelor's degree in fashion merchandising after carrying a high grade point average and being elected to a national honor society.

70.   After graduation, Westwood did not provide her with the job placement that she was promised by the admissions representative who convinced Bernal to enroll.   Bernal independently applied for many jobs in her field only to be told that she lacked the necessary experience or skills.  Bernal learned that she needed knowledge of certain program software that Westwood never taught her during her three-year program.  In short, upon graduating, Bernal discovered that three years of Westwood "education" had not prepared her to work in her field of study.

71.   The only help Bernal received from Westwood were emails called "job blasts" that led to either dead ends or publicly attainable job search resources, such as www.creativejobscentral.com, Craig's List, and www.monster.com.

72.   Bernal has now been unsuccessfully looking and applying for jobs in her field of study for two years.  Currently, she is employed as a part-time bank teller – a job that is clearly unrelated to fashion merchandising.

73.   Throughout the enrollment process, Bernal relied solely on the guidance of the admissions representative to direct her through the enrollment process because she understood her to be an expert qualified to provide the assistance needed to make an enrollment decision. Bernal relied on the admissions representative's representations of costs, fees, job placement opportunities and salary expectations, and accreditation in making her decision to attend Westwood.   The admissions representative never informed Bernal that the admissions representative was actually a sales-driven recruiter rather than an academic counselor.

74.   If Bernal had known the true costs and fees associated with the program; the actual job-placement and salary expectations for her career field; or the value of a nationally-accredited

degree, she would not have enrolled at Westwood.  Bernal has suffered severe financial injury as a direct result of Defendants' common course of conduct.

75.   Bernal graduated with $74,243 in federal and private loans disbursed on her behalf to Westwood.  Interest on these loans is accruing on a daily basis.

## ALLEGATIONS SPECIFIC TO AMANDA KROL

76.   Krol first contacted Westwood in or around January 2004 when she was searching for an online school to pursue a career in technology.  Krol filled out an online form that expressed her interest in an online education.

77.   Immediately after submitting the form, an admissions representative from Westwood College Online called Krol at home and began recruiting her.

78.   The admissions representative told Krol that all the credits she earned would be transferable to other colleges.  Later on, while attending Westwood College Online, Krol learned that this representation was not true as several schools rejected her credits.

79.   The admissions representative also told Krol that Westwood would help her find a job after graduation and that she could expect to make over $100,000 a year while working for organizations like Disney or the FBI.

80.   The admissions representative further withheld from Krol the total costs of the Westwood Online program and assured Krol that financing would be easily obtainable and readily paid off given that Krol would soon achieve a high-paying job in the field of her choice.

81.   The admissions representative's promises of a great education and a bright future convinced Krol to enroll at Westwood College Online.  Krol is a single mother and had hopes of achieving an education that would better her ability to provide for her child.

82.     After committing to enrollment, a Westwood representative walked Krol through the financial aid application process so that both she and her mother could apply for and obtain loans to fund the Westwood program.   When applying for financial aid, Westwood instructed Krol as to the amount she should request.   Krol was never informed of the total costs associated with attendance nor the price of her books.   When her books were delivered, the price of the books was redacted from the invoice.

83.     After completing a few terms in the technology program, Krol decided to change majors to the criminal justice program.   A Westwood admissions representative assured Krol that she would be able to complete the criminal justice program in less than three years.   This assurance proved to be false as Westwood took advantage of the course change by tacking on several classes and collecting much more money for tuition and costs.   All the while, the admissions representatives, who had been so eager to help Krol during enrollment, were no longer communicating with her.

84.     The lack of communication and ever-rising debt caused Krol to grow unhappy with Westwood College Online and she sought to transfer to a traditional college.   She researched several schools and each informed her that the Westwood credits would not transfer because Westwood College Online was not regionally accredited.   This was in direct contravention to what the admissions representative told her when she was considering enrollment.

85.     Having learned that her credits would not transfer, Krol felt that she had no choice but to complete her Westwood "education" because she and her mother were already tens of thousands of dollars in debt.

86.   Krol graduated in May 2009 with a degree in Criminal Justice.  She has yet to find a job in her field of study and has not received the help finding a high-paying job that Westwood promised her during enrollment.  Krol currently works for a family member's online business.

87.   Throughout the enrollment process, Krol relied solely on the guidance of the admissions representative to direct her through the enrollment process because she understood the representative to be an expert qualified to provide the assistance needed to make an enrollment decision.  Krol relied on the admissions representative's representations of costs, fees, job placement opportunities and salary expectations, and accreditation in making her decision to attend Westwood.  The admissions representative never informed Krol that the admissions representative was actually a sales-driven recruiter rather than an academic counselor.

88.   If Krol had known the true costs and fees associated with the program; the actual job-placement and salary expectations for her career field; or the value of a nationally-accredited degree, she would not have enrolled at Westwood.  Krol has suffered severe financial injury as a direct result of Defendants' common course of conduct.

89.   Krol graduated with $86,707 in federal and private loans disbursed on her behalf to Westwood.  Interest on these loans is accruing on a daily basis.  Much of this debt is secured by both Krol and her mother.

## CLASS ALLEGATIONS

90.   Pursuant to Federal Rules of Civil Procedure 23(a) and (b), Plaintiffs make the following class action allegations:

91. Defendants acted in such a manner that Plaintiffs and each Class Member did not know and should not have known that Defendants were engaging in false, deceptive or misleading practices at the time they occurred. Plaintiffs and Class Members, exercising reasonable due diligence, had no way to discover the occurrence of Defendants' false, misleading and deceptive practices until well after leaving Westwood.

## A.     Class Definition

92. Plaintiffs Krystle Bernal and Amanda Krol bring this action on behalf of themselves and the following Class of persons similarly situated. The "Class" or "Class Members" are defined as:

> All persons who are or have attended or participated in education programs conducted and operated by Defendants.

93. Excluded from the Class definition are (i) persons residing in California; (ii) persons residing in Texas or Wisconsin who attended Westwood College Online; (iii) Defendants; (iv) the officers, directors or employees of any Defendant; (v) any entity in which any Defendant has a controlling interest; (vi) any affiliate of any Defendant; (vii) any federal, state or local governmental entity; and (viii) any presiding judicial officer and any member of the judicial officer's family and court staff.

94. As set forth below, Plaintiffs will meet the requirements of Rule 23 of the Federal Rules of Civil Procedure to maintain this lawsuit as a class action.

## B.     Numerosity

95. The Members of the Class are so numerous that separate joinder of each Member is impracticable. The exact number of Class Members is currently unknown and will be obtained through discovery. However, approximately 15,000 students are currently enrolled at the various

Westwood campuses and there are at least 24,000 graduates nationwide.[33]  This creates a Class size of more than 39,000 former and current students.  Under any standard, this figure shows that the putative Class will satisfy numerosity.  Plaintiffs believe that the names and last-known addresses of the Class Members are readily attainable from Defendants.

## C.    Commonality

96.    Plaintiffs raise questions of law and fact common to the claims of all Class Members and defenses of Defendants.   Among the issues of law and fact common to the Plaintiffs and the Class are, without limitation:

a.    Whether the Individual Defendants engaged in a deceptive trade practice through devising, implementing, authorizing, or sanctioning the internal policies or comprehensive training programs that gave rise to the deceptive trade practices described herein in violation of C.R.S. Section 6-1-101 *et seq.;*

b.    Whether the Corporate Defendants engaged in a deceptive trade practice through the knowing misrepresentations and omissions regarding the costs and fees associated with enrollment in violation of C.R.S. Section  6-1-101 *et seq.*;

c.    Whether the Corporate Defendants engaged in a deceptive trade practice through the knowing misrepresentations and omissions regarding the meaning and reputation of a nationally-accredited school and the transferability of credits in violation of C.R.S. Section  6-1-101 *et seq.*;

d.    Whether the Corporate Defendants engaged in a deceptive trade practice through the knowing misrepresentations and omissions regarding the job placement opportunities, salary expectations, and statistics of past graduates in violation of C.R.S. Section 6-1-101 *et seq.*; and

e.    Whether the Corporate Defendants engaged in a deceptive trade practice through the knowing misrepresentations and omissions regarding the

---

[33] The actual number of that enrollment is apparently unclear to Westwood itself.  Westwood's website advertises a current enrollment of 15,000 and more than 24,000 graduates.  http://www.westwood.edu/why-westwood/about-us/. However, a Westwood spokesperson defended "40,000 graduates and 20,000 students" to *The Colorado Statesman* for a report on verbal attacks made against Westwood College by Colorado Senate candidate Andrew Romanoff. Whichever figures are correct, numerosity is clearly satisfied.

positions and qualifications of sales associates as qualified admissions representatives in violation of the Colorado Department of Education policies and C.R.S. Section 6-1-101 *et seq.*

## D.    Typicality

97.    The claims advanced by Plaintiffs are typical of the claims of each Class Member in that Plaintiffs and all Class Members have been damaged in the same way arising out of Defendants' uniform misrepresentations and omissions.  As a result of Defendants' deceptive trade practices, Plaintiffs and each Class Member were subjected to uniform misleading and deceptive information that caused them to enroll at Westwood.  Accordingly, the interests of the representative Plaintiffs are co-extensive with the interest of each Class Member and all have a common right of recovery based on the same facts.

## E.    Adequacy

98.    Plaintiffs can and have agreed to fairly and adequately protect the best interests of each Class Member.  Plaintiffs are aware of their responsibility to the Class and are determined diligently to discharge those duties, and have no interest which is adverse to or in conflict with other Class Members.

99.    Plaintiffs have retained counsel who is experienced in prosecuting large and complex class action cases and who is familiar with the legal issues raised in this lawsuit.  As a result, Plaintiffs' counsel will adequately protect the interests of the Class.

## F.    Predominance and Superiority

100.  The questions of law or fact common to the claims of Plaintiffs and the claims of each Class Member predominate over any question of law or fact affecting only individual Class Members.  Given the number of Class Members; the common financial distress caused to each

Class Member; the typicality of Plaintiffs' claims to those of the Class Members; the adequate representation of the Class Members by Plaintiffs; and the interests of judicial economy, the class action device is superior to other methods for the fair and efficient resolution of this controversy.

101. Individual Class Members would not benefit from controlling their own separate lawsuits. Individual lawsuits against Defendants' several well-financed corporations would pose too great a burden to individual Class Members such that many claims would not be litigated and Class Members would not obtain the relief they are entitled to from Defendants. Certification of a class would promote judicial economy, as the number of students involved would unduly congest and burden the courts if each brought an individual action. Due to the systemic nature of Defendants' actions, Plaintiffs can think of no difficulty in the management of this controversy as a class action.

## COUNT ONE

**VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT
C.R.S. § 6-1-101 *et seq.* AGAINST ALL DEFENDANTS**

102. Plaintiffs incorporate by reference each and every allegation set forth in paragraphs 1 through 101 as though fully set forth herein.

103. Section 6-1-105(1) provides that it is a deceptive trade practice when a person, "in the course of his business, vocation or occupation" commits any one of a list of enumerated deceptive trade practices that impacts the public.

104.  Defendants qualify as a "person" as defined by the statute. [34]  The broad definition of "person" provides for liability of the Individual Defendants and the Corporate Defendants.

105.  The Corporate Defendants are in the business of operating for-profit colleges which entails the solicitation and enrollment of students into educational programs in the effort to turn a profit on the amount the students spend on tuition and other fees.  The Individual Defendants are in the business of devising, implementing, authorizing, or sanctioning the internal policies or comprehensive training programs for the Corporate Defendants that teaches Westwood's admissions and financial aid representatives how to deceive potential students in the uniform manner described herein.  Therefore, the conduct complained of here takes place in the course of Defendants' business as the conduct directly relates to the Corporate Defendants' operation of for-profit colleges and the Individual Defendants' creation, authorization, or sanctioning of internal policies or training programs designed to carry out the deceptive trade practices.

106.  The conduct complained of here has a major impact on the public.  The Corporate Defendants earn hundreds of millions of dollars each year as a result of their deceptive trade practices.  Each student who is convinced to enroll at Westwood incurs tens of thousands of dollars of tuition and fee costs.  There are more than 15,000 students enrolled at Westwood and tens of thousands more who have already graduated or dropped out.  The internal policies or training programs that are devised, implemented, authorized, or sanctioned by the Individual Defendants are instrumental in convincing prospective students to enroll at Westwood. Therefore, Defendants' conduct clearly and emphatically impacts the public.

---

[34] CRS §6-1-102(6) defines "person" as: "an individual, corporation, business trust, estate, trust, partnership, unincorporated association, or two or more thereof having a joint or common interest, or any other legal or commercial entity."

107.  Section 6-1-105(1)(b) provides that it is a deceptive trade practice to make a false representation as to, *inter alia*, approval or certification of goods, services, or property. Defendants violated C.R.S. Section 6-1-105(1)(b) by, without limitation:

    a.  uniformly and knowingly misrepresenting and omitting critical information about the true quality and value of a Westwood education;

    b.  uniformly and knowingly misrepresenting and omitting critical information about the true quality and value of Westwood's national accreditation;

    c.  uniformly and knowingly misrepresenting and omitting critical information about the true quality and value of Westwood's candidacy for regional accreditation;

    d.  uniformly and knowingly omitting that Westwood had failed to attain regional accreditation;

    e.  uniformly and knowingly misrepresenting that the national accreditation granted to Westwood is equal or greater to regional accreditation; and

    f.  uniformly and knowingly misrepresenting or omitting the true value of credits obtained at a nationally-accredited institution, as judged by the transferability of the credits to a regionally-accredited institution.

108.  Section 6-1-105(1)(c) provides that it is a deceptive trade practice to make a false representation as to affiliation, connection, or association with or certification by another. Defendants violated C.R.S. Section 6-1-105(1)(c) by, without limitation:

    a.  uniformly and knowingly misrepresenting and omitting critical information about the true quality and value of a Westwood education;

    b.  uniformly and knowingly misrepresenting and omitting critical information about the true quality and value of Westwood's national accreditation;

    c.  uniformly and knowingly misrepresenting and omitting critical information about the true quality and value of Westwood's candidacy for regional accreditation;

    d.  uniformly and knowingly omitting that Westwood had failed to attain regional accreditation;

    e.  uniformly and knowingly misrepresenting that the national accreditation granted to Westwood is equal to or greater than regional accreditation;

    f.  uniformly and knowingly misrepresenting or omitting the true value of credits obtained at a nationally-accredited institution, as judged by the transferability of the credits to a regionally-accredited institution; and

    g.  uniformly and knowingly misrepresenting that Defendants are affiliated with major corporations related to various programs offered by Westwood.

109.  Section 6-1-105(1)(g) provides that it is a deceptive trade practice to represent that goods or services are of a particular standard, if Defendants knew or should have known that they are of another.  It is common industry knowledge that regional accreditation is more widely sought after and is the type of accreditation commonly awarded to traditional colleges and universities.  Defendants know or should know that national accreditation is not widely accepted by other universities for credit transfers or degree recognition.  Defendants violated C.R.S. Section 6-1-105(1)(g) by, without limitation:

    a.  uniformly and knowingly misrepresenting and omitting critical information about the true quality and value of a Westwood education;

    b.  uniformly and knowingly misrepresenting and omitting critical information about the true quality and value of Westwood's national accreditation;

    c.  uniformly and knowingly misrepresenting and omitting critical information about the true quality and value of Westwood's candidacy for regional accreditation;

    d.  uniformly and knowingly omitting that Westwood had failed to attain regional accreditation;

    e.  uniformly and knowingly misrepresenting that the national accreditation granted to Westwood is equal to or greater than regional accreditation; and

    f.  uniformly and knowingly misrepresenting or omitting the true value of credits obtained at a nationally-accredited institution, as judged by the transferability of the credits to a regionally-accredited institution.

110.  Section 6-1-105(1)(l) provides that it is a deceptive trade practice to make false or misleading statements of fact concerning the price of goods or services.  Defendants violated C.R.S. Section 6-1-105(1)(l) by, without limitation:

    a.  uniformly providing misleading and confusing calculations regarding the costs and fees associated with enrollment;

    b.  uniformly misrepresenting the total cost of programs; and

    c.  uniformly omitting various fees and ancillary costs that the student will incur.

111.  Section 6-1-105(1)(u) provides that it is a deceptive trade practice to fail to disclose material information concerning goods or services which information was known at the time of the advertisement or sale if such failure to disclose such information was intended to induce the customer to enter into the transaction.  Defendants violated C.R.S. Section 6-1-105(1)(u) by intending to induce potential students to enroll at Westwood by, without limitation:

    a.  uniformly misrepresenting and omitting critical information about the true quality and value of a Westwood education;

    b.  uniformly misrepresenting and omitting critical information about the true quality and value of Westwood's national accreditation;

    c.  uniformly misrepresenting and omitting critical information about the true quality and value of Westwood's candidacy for regional accreditation;

    d.  uniformly omitting that Westwood had failed to attain regional accreditation;

    e.  uniformly misrepresenting that the national accreditation granted to Westwood is equal to or greater than regional accreditation;

    f.  uniformly misrepresenting or omitting the true value of credits obtained at a nationally-accredited institution, as judged by the transferability of the credits to a regionally-accredited institution;

    g.  uniformly providing misleading and confusing calculations regarding the costs and fees associated with enrollment;

    h.   uniformly misrepresenting the total cost of programs;

    i.   uniformly omitting various fees and ancillary costs that the student will incur;

    j.   uniformly providing false or misleading information about job placement opportunities and salary expectations;

    k.   uniformly misrepresenting the percentage of students employed in their field of study after graduation; and

    l.   uniformly overstating the salaries students obtain after graduation.

112.  Section 6-1-105(3) of the CCPA states that the deceptive trade practices listed within the statute are in addition to other unfair trade practices actionable at common law or under other state statutes.

113.  Section 6.01.05(A) of the Colorado Department of Education policies, in and through the Degree Authorization Act, provides that it is a deceptive trade practice for a school or agent to make or cause to be made any statement or representation, oral, written or visual, in connection with the offering of educational services if such school or agent knows or reasonably should have known the statement or representation to be materially false, substantially inaccurate or materially misleading.  The practices previously described herein indicate that Defendants knew or should have known the false, inaccurate or misleading nature of the incorporated statements.  Defendants violated Section 6.01.05(A) of the Colorado Department of Education policies through C.R.S. Section 6-1-105(3) by, without limitation:

    a.   uniformly and knowingly misrepresenting and omitting critical information about the true quality and value of a Westwood education;

    b.   uniformly and knowingly providing misleading and confusing calculations regarding the costs and fees associated with enrollment;

    c.   uniformly and knowingly misrepresenting the total cost of programs;

d.  uniformly and knowingly omitting various fees and ancillary costs that the student will incur;

e.  uniformly and knowingly providing false or misleading information about job placement opportunities and salary expectations;

f.  uniformly and knowingly misrepresenting the percentage of students employed in their field of study after graduation;

g.  uniformly and knowingly overstating the salaries students obtain after graduation;

h.  uniformly and knowingly misrepresenting and omitting critical information about the true quality and value of Westwood's national accreditation;

i.  uniformly and knowingly misrepresenting and omitting critical information about the true quality and value of Westwood's candidacy for regional accreditation;

j.  uniformly and knowingly omitting that Westwood had failed to attain regional accreditation;

k.  uniformly and knowingly misrepresenting that the national accreditation granted to Westwood is equal to or greater than regional accreditation;

l.  uniformly and knowingly misrepresenting or omitting the true value of credits obtained at a nationally-accredited institution, as judged by the transferability of the credits to a regionally-accredited institution;

m.  uniformly and knowingly misrepresenting and omitting the role and qualifications of admissions representatives;

n.  uniformly and knowingly designating as "admissions representatives" employees whose primary job duties were to recruit students in a manner that misleads prospective students or the public regarding the authority or qualifications of such employees; and

o.  uniformly and knowingly omitting that the "admissions representatives" were actually sales people who are incentivized to enroll as many students as possible in order to meet quotas and receive financial rewards and promotions.

114. Section 6.01.05(D) of the Colorado Department of Education policies, in and through the Degree Authorization Act, provides that it is a deceptive trade practice for a school or agent to intentionally and materially misrepresent that a student may transfer credit to any

institution of higher education.   Defendants violated Section 6.01.05(D) of the Colorado Department of Education policies through C.R.S. Section 6-1-105(3) by materially misleading or deceiving prospective students by, without limitation:

    a.  uniformly and intentionally misrepresenting and omitting critical information about the true quality and value of a Westwood education;

    b.  uniformly and intentionally misrepresenting and omitting critical information about the true quality and value of Westwood's national accreditation;

    c.  uniformly and intentionally misrepresenting and omitting critical information about the true quality and value of Westwood's candidacy for regional accreditation;

    d.  uniformly and intentionally omitting that Westwood had failed to attain regional accreditation;

    e.  uniformly and intentionally misrepresenting that the national accreditation granted to Westwood is equal to or greater than regional accreditation; and

    f.  uniformly and intentionally misrepresenting or omitting the true value of credits obtained at a nationally-accredited institution, as judged by the transferability of the credits to a regionally-accredited institution.

115. Section 6.01.05(E) of the Colorado Department of Education policies, in and through the Degree Authorization Act, provides that it is a deceptive trade practice for a school or agent to intentionally and materially misrepresent, *inter alia,* the extent or nature of any accreditation received from any accrediting agency or association.   Defendants violated Section 6.01.05(E) of the Colorado Department of Education policies through C.R.S. Section 6-1-105(3) by materially misleading or deceiving prospective students by, without limitation:

    a.  uniformly and intentionally misrepresenting and omitting critical information about the true quality and value of a Westwood education;

b.  uniformly and intentionally misrepresenting and omitting critical information about the true quality and value of Westwood's national accreditation;

c.  uniformly and intentionally misrepresenting and omitting critical information about the true quality and value of Westwood's candidacy for regional accreditation;

d.  uniformly and intentionally omitting that Westwood had failed to attain regional accreditation;

e.  uniformly and intentionally misrepresenting that the national accreditation granted to Westwood is equal to or greater than regional accreditation; and

f.  uniformly and intentionally misrepresenting or omitting the true value of credits obtained at a nationally-accredited institution, as judged by the transferability of the credits to a regionally-accredited institution.

116.  Section 6.01.05(F) of the Colorado Department of Education policies, in and through the Degree Authorization Act, provides that it is a deceptive trade practice for a school or agent to provide prospective students with any information that may materially mislead or deceive prospective students or the public regarding current practices of the school.  The practices previously described herein indicate that Defendants uniformly provided materially misleading information to prospective students and the public via the websites and the information provided by admissions representative during the enrollment process.  Defendants violated Section 6.01.05(F) of the Colorado Department of Education policies through C.R.S. Section 6-1-105(3) by, without limitation:

a.  uniformly misrepresenting and omitting critical information about the true quality and value of a Westwood education;

b.  uniformly providing misleading and confusing calculations regarding the costs and fees associated with enrollment;

c.  uniformly misrepresenting the total cost of programs;

d.  uniformly omitting various fees and ancillary costs that the student will incur;

e.  uniformly providing false or misleading information about job placement opportunities and salary expectations;

f.  uniformly misrepresenting the percentage of students employed in their field of study after graduation;

g.  uniformly overstating the salaries students obtain after graduation;

h.  uniformly misrepresenting and omitting critical information about the true quality and value of Westwood's national accreditation;

i.  uniformly misrepresenting and omitting critical information about the true quality and value of Westwood's candidacy for regional accreditation;

j.  uniformly omitting that Westwood had failed to attain regional accreditation;

k.  uniformly misrepresenting that the national accreditation granted to Westwood is equal to or greater than regional accreditation;

l.  uniformly misrepresenting or omitting the true value of credits obtained at a nationally-accredited institution, as judged by the transferability of the credits to a regionally-accredited institution;

m.  uniformly misrepresenting and omitting the role and qualifications of admissions representatives;

n.  uniformly designating as "admissions representatives" employees whose primary job duties were to recruit students in a manner that misleads prospective students or the public regarding the authority or qualifications of such employees;

o.  uniformly omitting that the "admissions representatives" were actually sales people who are incentivized to enroll as many students as possible in order to meet quotas and receive financial rewards and promotions; and

p.  uniformly and materially misleading or deceiving prospective students and the public regarding current practices via their websites and through information provided by admissions representatives.

117.  Section 6.01.05(H) of the Colorado Department of Education policies, in and

through the Degree Authorization Act, provides that it is a deceptive trade practice for a school

or agent to designate titles to employees whose primary job duties are to recruit students that may mislead prospective students or the public regarding the authority or qualifications of such employees.  Defendants violated Section 6.01.05(H) of the Colorado Department of Education policies through C.R.S. Section 6-1-105(3) by:

a.  uniformly designating as "admissions representatives" those whose primary job duties were to recruit students in a manner that misleads prospective students or the public regarding the authority or qualifications of such employees; and

b.  uniformly omitting that the "admissions representatives" were actually sales people who are incentivized to enroll as many students as possible in order to meet quotas and receive financial rewards and promotions.

118.   Plaintiffs and Class Members are consumers of Defendants' goods, services, or property and have suffered actual damages in the amount of tuition, costs and fees.  The amount of damages is readily ascertainable for each student as the amount of money Defendants collected on behalf of the student.

119.   Defendants acted willingly, knowingly or intentionally, and their common course of conduct caused direct financial injury to Plaintiffs and Class Members.

120.   Plaintiffs seek all remedies and damages available under C.R.S. Section 6-1-113.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and each Class Member, requests the following relief:

a.  An Order certifying the proposed Class, as defined above, and appointing Plaintiffs and the undersigned counsel of record to represent the Class;

b.  An Order issuing a preliminary injunction enjoining Defendants from continuing to take unlawful action as set forth in this Complaint, including, without limitation, prohibiting Defendants from soliciting and enrolling students through deceptive trade practices;

c.   An Order issuing a permanent injunction enjoining Defendants from continuing to take unlawful action as set forth in this Complaint, including, without limitation, prohibiting Defendants from soliciting and enrolling students through deceptive trade practices;

d.   A Judgment against Defendants awarding Plaintiffs and Class Members all remedies and damages available under C.R.S. Section 6-1-113;

e.   For such other and further relief to which Plaintiffs and Class Members are duly entitled.

## JURY DEMAND

Plaintiffs request a trial by jury on all claims so triable.

Respectfully submitted this 11th day of August, 2010.

PENDLETON, FRIEDBERG, WILSON
& HENNESSEY, P.C.


By: s/ Timothy M. Kratz
Alan C. Friedberg
Timothy M. Kratz
1875 Lawrence Street, 10th Floor
Denver, CO 80202-1898
Telephone: 303-839-1204
Facsimile: 303-831-0786
E-mail: afriedberg@penberg.com
E-mail: kratz@penberg.com

JAMES, HOYER, NEWCOMER, SMILJANICH &
YANCHUNIS, P.A.
John A. Yanchunis (Fla. Bar No. 0324681)
        jyanchunis@jameshoyer.com
Jonathan B. Cohen (Fla. Bar No. 0027620)
        jcohen@jameshoyer.com
Sean Estes (Fla. Bar No. 0055770)
        sestes@jameshoyer.com
4830 West Kennedy Boulevard
Urban Center One, Suite 550
Tampa, FL 33609
Telephone: 813-286-4100
Facsimile: 813-286-4174

**ATTORNEYS FOR PLAINTIFFS**